ORVILLE C. WACKER and PEARL WACKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wacker v. Commissioner
Docket No. 11298-77.
United States Tax Court
T.C. Memo 1980-324; 1980 Tax Ct. Memo LEXIS 260; 40 T.C.M. (CCH) 1009; T.C.M. (RIA) 80324; August 19, 1980, Filed Lee M. Galloway, *262 for the petitioners. Gerald J. Beaudoin, for the respondent. SCOTT MEMORANDUM OPINION SCOTT, Judge: Respondent determined deficiencies in the joint Federal income tax of Orville C. Wacker and Pearl Wacker in the amounts of $119,914.64 and $42 for calendar years 1974 and 1975, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision: (1) Whether a 1974 agreement between petitioners, as the sellers of Royal Villa Garden Apartments, and the property's buyers operated to cause the purchasers' prior installment obligation to be satisfied or disposed of in 1974 within the meaning of section 453(d), I.R.C. 1954; [1]
(2) whether pursuant to section 453 petitioners are required to include in the amount they received from the sale of Royal Villa Garden Apartments the *263 excess of the mortgages on that property over their basis in the property in computing their income for either 1974 or 1975; (3) whether petitioners properly included in their income interest paid by the purchasers on the mortgage indebtedness and properly deducted an equal amount as interest paid in 1974 and 1975; (4) whether petitioners are entitled to a claimed net operating loss deduction in 1975; [2]
(5) whether petitioners are entitled to fully deduct in 1974 the unamortized balance of the loan expense relating to the sale of Royal Villa Garden Apartments; and (6) whether the amount of $5,964 paid by petitioners in 1974 for a property survey qualifies for an ordinary and necessary business expense deduction, or whether petitioners must capitalize that expenditure. All of the facts have been stipulated and are found accordingly. Orville C. Wacker and Pearl Wacker, husband and wife, who resided in Carmichael, California, at the time of filing their petition *264 in this case, timely filed their joint Federal income tax returns for calendar years 1974 and 1975 with the Internal Revenue Service Center, Fresno, California. For calendar year 1974, petitioners filed their amended joint Federal income tax return with the Internal Revenue Service Center, Fresno, California. In the early 1960's Mr. Wacker constructed in Sacramento, California, a 296-unit apartment complex known as Royal Villa Garden Apartments (Royal). The apartment development was financed through loans made by General Savings and Loan Association (General), Sacramento Savings and Loan Association (Sacramento), and Fresno Guarantee Savings and Loan Association (Fresno). The bank loans were evidenced by petitioners' promissory notes and were secured by first and second deeds of trust. As a result of the Wackers' failure to pay some of the monthly installments due on those loans outstanding from General, Sacramento, and Fresno, on September 1, 1967, petitioners and the savings and loan corporations entered into a Loan Consolidation and Standby Agreement. At that time General, now known as Fidelity Savings and Loan Association (Fidelity), Sacramento, and Fresno agreed to collectively *265 cancel the numerous outstanding promissory notes and deeds of trust in exchange for one promissory note and deed of trust. The new promissory note with total principal amount of $2,208,007.92, dated September 1, 1967, was repayable by petitioners over a period of 24 years in equal monthly installments commencing on October 1, 1967, with interest at the rate of 6-6/10 percent per annum effective through August 31, 1972, and thereafter with interest at a rate of 7 percent per annum. All monthly payments by petitioners were to be made directly to Fidelity. In turn Fidelity would disperse to each of the other two savings and loan associations their pro rata shares of the principal and interest payments. The new deed of trust instrument provided for a first deed of trust on 248 apartment units and a second deed of trust on the remaining 48 units. The contract provided that petitioners would deposit into escrow for delivery to the savings and loan associations an "Absolute Assignment of Rents," which, in event of default by petitioners, would give the associations the authority to collect rents from the apartment complex and to apply those sums to the balance due under the agreement. *266 Prior to May 1969 petitioners received loans from Imperial Savings and Loan Association (Imperial) and World Savings and Loan Association (World). Securing the promissory notes payable to Imperial in the total amount of $275,000 were first deeds of trust on 32 of the Royal apartment units, and securing the four promissory notes aggregating $114,400 payable to World were deeds of trust on 16 Royal apartment units. On May 27, 1969, petitioners sold Royal to Dan and Anita Bodily (Bodilys) for the purchase price of $2,796,500. At that time petitioners' adjusted basis in the Royal property was $1,774,231.48. The terms of the sale were embodied in a document entitled "Installment Contract of Sale" (Installment Contract) which provided for a downpayment of $12,500. The remaining principal balance of $2,784,000 would be payable in monthly installments of $23,700, including interest at a rate of 10 percent per annum.The Installment Contract provided that the Bodilys would deposit $387,500 with petitioners as prepaid interest. Petitioners were obligated to apply on a monthly basis a portion of the deposit to reduce the monthly interest payment owed by the purchasers. Paragraph 2(F) *267 of the Installment Contract provided the Bodilys with a special payment option exercisable by written notice at least six months prior to the expiration of the fifth contract year. If the Bodilys failed to exercise the option, on the sixth anniversary date of the recordation of the Installment Contract the Bodilys were required to pay to petitioners the balance of the purchase price and all accrued interest thereon. Specifically, the Installment Contract provides: [3]
D. Vendee shall not have the right to prepay the purchase price of the subject property, or any part thereof during the five (5) year period commencing upon recordation of this or any *268 other document giving notice of Vendee's interest in the subject property; however, after the expiration of said five (5) year period, any payment hereafter called for may be prepaid without penalty. E.Except in the event of the exercise by Vendee of the option given to them under subparagraph "F", below, the balance of the purchase price, and all accrued interest thereon shall be paid on the sixth (6th) anniversary of the date upon which this or any other document giving notice of Vendee's interest in the subject property was recorded, by Vendee's assuming the unpaid balances of the loans secured by the existing deeds of trust, delinquent taxes, and other encumbrances upon the subject property, as said loans any deeds of trust are described in Paragraph "4", below, by applying the amount of said assumed indebtedness toward the balance of the purchase price, and by paying the balance of the purchase price and accrued interest thereon, in cash to Vendor. (1) If the balance of the purchase price is paid in cash to the Vendor, it shall pay and discharge any and all liens and encumbrances against the subject property, except for those liens which are payable by Vendee by the terms *269 of this agreement as hereinafter provided in paragraph "4". (2) Upon the execution of this agreement, the Vendor shall deposit in an escrow with the TITLE INSURANCE & TRUST COMPANY, 21st Street, Sacramento, California, a good and sufficient grant deed for the property being sold hereunder, suitable for recording, conveying the fee title to said property to the Vendee, together with appropriate instructions to the said escrow agent to deliver said deed upon receipt by it for the account of Vendor of the balance of the purchase price as required by this agreement, but not before the expiration of the period described in subparagraph 2-D above. (3) On the sixth (6th) anniversary of the date upon which this or any other document giving notice of Vendee's interest in the subject property was recorded, or before, Vendee shall deposit in said escrow all of the monies necessary to pay the balance of the contract price as hereinabove set forth, together with the appropriate instructions providing for the payment of the said sum to the Vendor upon the delivery of said deed to the Vendee. If additional instructions are required by the said escrow agent for the delivery of said deed, *270 the Vendee shall notify the Vendor in writing of the deposit and the need for additional instructions. Within ten (10) days after receipt of said notice, Vendor shall deposit said additional instructions in said escrow in such form to be sufficient to deliver the same deeds to the Vendee by the terms of this Agreement. (4) The premium for the policy of title insurance shall be paid for by Vendee. All other costs and fees of escrow shall be paid by the respective parties in accordance with the custom in the area. Vendee shall be responsible for paying the assumption fee required by the loan consolidation agreement equal to one-fourth of one percent of the then unpaid balance of the loan to be assumed. Vendee shall be responsible for satisfying all existing lenders as to the assumption and the responsibility of Vendee for assuming the loans. F. Providing Vendee gives at least six (6) months' written notice to Vendor prior to the expiration of the fifth year, then Vendee may, notwithstanding the provisions contained in subparagraph "E", above, Vendee shall have the right to satisfy the requirements of payment set forth in said subparagraph "E" by the payment of FIFTY THOUSAND *271 DOLLARS ($50,000.00) cash, toward the unpaid balance of said purchase price and by the execution and delivery to Vendor of their promissory note, in the standard and usual form used by the escrow agent processing this transaction, in the amount of the resulting unpaid balance of said purchase price, as determined in accordance with said subparagraph "E". Said note shall bear interest at the rate of ten per cent (10%) per annum on the unpaid principal balance, shall be payable in equal monthly installments of one per cent (1%) of the face amount of said note, or more, principal and interest included, with the entire unpaid balance of principal and interest becoming due and payable sixty (60) months from the date of execution thereof. Said promissory note shall be secured by a deed of trust upon the property being sold hereunder, in the standard form used by said escrow agent, which deed of trust shall be subject and subordinate to the then existing deeds of trust and encumbrance of record. Said note and deed of trust shall contain a "due on sale" clause giving the holder the right to declare the entire unpaid balance immediately due and payable upon the transfer of the subject *272 property, or of any interest therein without the prior written consent of said holder. * * *
4. LIENS AND ENCUMBRANCES: CONDITION OF TITLE: Title to the subject property shall be free and clear of all liens and encumbrances except for the lien for current taxes which are not yet delinquent, the liens of the deeds of trust and other encumbrances listed in Exhibit "B" attached hereto and incorporated herein by reference as if set forth in full herein. Vendor further represents and warrants that it shall not cause, permit or suffer any further or additional liens or encumbrances to be placed upon or imposed upon the subject property, without the prior written consent of the Vendee. Except that Vendee acknowledges that * * * consolidation and standby agreement the lendors are authorized to add to the existing deeds of trust an amount necessary to make up the deficit, if any, in the trust impound, for the payment of the annual installment on the delinquent taxes. This amount will not exceed FORTY THOUSAND DOLLARS ($40,000.00). Vendor shall make all payments due or which shall become due on account of the payments of principal and interest on the loan secured by the deeds *273 of trust, listed in Exhibit "B" attached hereto. Prior to the sale of Royal petitioners had agreed to pay their real estate broker a sales commission of $35,000. After petitioners and the Bodilys executed the Installment Contract, petitioners renegotiated the terms of the brokerage commission, which were embodied in a May 28, 1969, "Modification of Agreement to Pay Broker's Commission." The modification provided for petitioners to submit $25,000 to the broker upon petitioners' receipt of the Bodilys' $12,500 downpayment and $337,500 prepaid interest. Additionally, petitioners agreed to pay the broker an extra $10,000 payable upon receipt of the sums due from DAN BODILY and ANITA BODILY to Owner under Paragraph II.E. of the Installment Contract of Sale under which DAN BODILY and ANITA BODILY are purchasing the property, or upon receipt of the FIFTY THOUSAND DOLLARS ($50,000.00) cash payment under Paragraph II.F. of the Installment Contract of Sale, or when Owner has been paid any sums in excess of the monthly installment payments called for by the said Installment Contract of Sale, whichever of them is sooner. On May 29, 1969, the Bodilys, as lessors, leased back Royal to *274 petitioners for a period of 5 years. The lease provided that the aggregate base rent would be $1,115,520 payable in monthly installments of $18,592. As additional rent the parties agreed that the Lessee shall pay, when due, all real and personal property taxes, including the payments due under the five year plan for delinquent taxes on the property, assessments and charges and all liability and fire and casualty insurance premiums to be paid on the insurance policies required under this lease * * *. Under the lease agreement if petitioners-lessees should during the term of the lease, cease to personally manage the premises, the parties hereto agree that Lessee shall hire and engage the CARRIAGE PROPERTY MANAGEMENT COMPANY, or any other professional management company acceptable to the Lessor which shall be responsible to undertake the obligations of the Lessee to maintain and repair the demised premises, including a program of preventative maintenance reasonable for an equivalent property in the greater Sacramento area. * * * All fees for said services, as well as all expenses incurred in the current and deferred maintenance of the subject properties, shall be borne and paid *275 for solely by Lessee, including reasonable replacement of the fixtures, furnishings and other personal property. Furthermore, the lessees agreed to maintain the premises and appurtenances in good order and condition. The lease also provided that if the lessees neglected to perform any provision of the lease, the lessors could enter the premises; expel the lessees; and expend, at the cost of the lessees, the moneys necessary to repair the premises to its pre-demise condition. A dispute over improper care and maintenance of Royal arose between petitioners and the Bodilys prior to the expiration of petitioners' lease. After negotiation the two parties resolved their differences by written agreement, dated July 1, 1974, which provides in full: AGREEMENT
THIS AGREEMENT made and executed this 1st day of July, 1974, by and between ORVILLE C. WACKER and PEARL M. WACKER, hereinafter called "WACKER", and DAN BODILY and ANITA BODILY, hereinafter called "BODILY", WITNESSETH:
WHEREAS, on or about May 27, 1969, WACKER as Sellers and BODILY as Buyers entered into a written agreement for the sale by WACKER to BODILY of the ROYAL VILLA GARDEN APARTMENTS, consisting of Two Hundred *276 Ninety-Six (296) apartment units at 4901 Royal Villa Drive, Sacramento, California, WHEREAS, on or about May 29, 1969, BODILY as Lessor and WACKER as Lessee entered into a written lease under the terms of which WACKER leased from BODILY said ROYAL VILLA GARDEN APARTMENTS, WHEREAS, under the terms of said Installment Contract of Sale dated May 27, 1969 the contract balance as of June 1, 1974 due from BODILY to WACKER is approximately TWO MILLION, SEVEN HUNDRED FORTY-FIVE THOUSAND TWO HUNDRED EIGHTY-ONE DOLLARS and THIRTY-NINE CENTS ($2,745,281.39), and the existing loan balances on all the first trust deeds after the June 1, 1974 payments are approximately TWO MILLION THREE HUNDRED FIFTY-FIVE THOUSAND SIX HUNDRED EIGHTY-FOUR DOLLARS and TWENTY-FIVE CENTS ($2,355,684.25), and WHEREAS, there is a dispute between BODILY and WACKER concerning, among other things, the amount of credit due BODILY for deferred maintenance, termite, pest damage, and other claims against WACKER by BODILY as a result of WACKER's possession as Lessee, WHEREAS, the parties have resolved their differences and WACKER has agreed to give BODILY a total credit for deferred maintenance, termite and pest damage, *277 and all other claims, the sum of ONE HUNDRED NINETEEN THOUSAND FIVE HUNDRED SIXTEEN DOLLARS AND FORTY-FIVE CENTS ($119,516.45) and the parties have further agreed that BODILY is entitled to a credit for proration of taxes, rents, lease payments, prepaid rent, and other credits, the sum of TWENTY THOUSAND EIGHTY DOLLARS and SIXTY-NINE CENTS ($20,080.69), or a net cash balance due WACKER of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00), WHEREAS, WACKER has further agreed to a further credit of FIVE THOUSAND DOLLARS ($5,000.00) and BODILY has agreed to pay WACKER in cash on execution of this Agreement, in exchange for a deed from WACKER to BODILY on the ROYAL VILLA GARDEN APARTMENTS the sum of TWO HUNDRED FORTY-FIVE THOUSAND DOLLARS ($245,000.00), WHEREAS, WACKER is indebted to CARRIAGE PROPERTY MANAGEMENT COMPANY under the terms of the original installment contract of sale for a commission in the sum of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) which has allegedly been assigned by CARRIAGE PROPERTY MANAGEMENT COMPANY to RAY GRAY, and BODILY has agreed to hold WACKER harmless therefrom in consideration of WACKER crediting BODILY with the sum of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) *278 on the balance of TWO HUNDRED FORTY-FIVE THOUSAND DOLLARS ($245,000.00). IT IS HEREBY AGREED AS FOLLOWS: 1.WACKER does hereby concurrently execute and deliver to BODILY his good and sufficient Grant Deed conveying to BODILY, subject to the existing first trust deeds, which BODILY agrees to assume pursuant to the terms of the Installment Contract of Sale dated May 27, 1969. 2. BODILY does hereby assume, and agree to hold WACKER harmless therefrom, any and all claims by Carriage property management company/ or RAY GRAY for the TWENTY-FIVE THOUSAND DOLLAR ($25,000.00) commission due from WACKER. 3. BODILY will defend any actions by CARRIAGE PROPERTY MANAGEMENT COMPANY or RAY GRAY against WACKER and will hold WACKER harmless from any and all claims, including any reasonable attorney fees incurred by WACKER in defending actions for said commission. 4. BODILY agrees to pay concurrently herewith to WACKER the sum of TWO HUNDRED TWENTY THOUSAND DOLLARS ($220,000.00) cash. 5. By reason of the fact that all rents were prorated as of June 1, 1974, all expenses incurred in operation of the apartment house accruing, after, and including June 1, 1974, are the obligation of BODILY. *279 6. Except as hereinbefore provided, each party does hereby release, and forever discharge the other party hereto from any and all other claims arising out of the purchase, sale, ownership, occupancy, possession of, or former ownership of the ROYAL VILLA GARDEN APARTMENTS. BODILY does hereby accept said apartments as is, and acknowledges that the deferred maintenance credit includes any and all claims BODILY may have had or may now have against WACKER arising out of the conditions of the premises, including but not limited to the roof, interior/exterior walls, carpeting, furniture, septic and sewage systems, grounds, rent deposits, lease deposits, cleaning deposits, and any and all other claims. IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written. The settlement was further refined in a detailed list which set forth the net contract balance due and cash items owed to petitioners as well as cash items due to the Bodilys. [4] Netting those sums, the parties concluded that the balance owed to petitioners was $211,622.07. *280 As a result of their obligation stated in the July 1, 1974, agreement, petitioners executed a grant deed on July 1, 1974. The deed granted to Security Title Insurance Company (Security), as trustee, the Royal property. This grant deed was recorded in Sacramento County on July 2, 1974. On July 1, 1974, petitioners entered into an "Assignment of Rights Under Agreement" assigning to the Bodilys all of petitioners' rights and privileges under the Loan Consolidation and Standby Agreement. The Assignment of Rights Under Agreement provides in full: Reference is made to that certain written agreement entitled "Loan Consolidation and Standby Agreement" dated September 1, 1967 between General Savings and Loan Association, a California corporation, Sacramento Savings & Loan Association, a California corporation, and Fresno Guarantee Savings and Loan Association, all three of said savings and loan associations being referred to therein as "Associations", and Orville C. Wacker and Pearl M. Wacker, his wife, referred to therein as "Wacker". Whereas, concurrently herewith, Dan Bodily and Anita Bodily are purchasing from Orville C. Wacker and Pearl M. Wacker the real *281 property which is the subject to the Deed of Trust described in said above mentioned agreement, and are accepting title subject to said Deed of Trust. Whereas, it is the intent of the parties that Dan Bodily and Anita Bodily succeed to all of the rights of Orville C. Wacker and Pearl M. Wacker under said above referenced agreement. Now, therefore, and as a part of the consideration for the purchase by Dan Bodily and Anita Bodily of said real property, and of the purchase price paid therefor, Orville C. Wacker and Pearl M. Wacker C. Wacker and Pearl M. Wacker do hereby assign unto Dan Bodily and Anita Bodily all of their rights and privileges of any nature contained in said "Loan Consolidation and Standby Agreement" above described, and agree to cooperate with said Dan Bodily and Anita Bodily (without any expense to said Orville C. Wacker and Pearl M. Wacker) in any litigation that may occur thereunder. On July 2, 1974, petitioners entered into a "Holding Agreement" with Security, which in pertinent part states: (1) Owner has or will cause to have, delivered to Security, as Trustee, under this Agreement, a Grant Deed which conveys title to Security, without consideration, *282 real property located in the County of Sacramento,State of California, as more particularly described in Exhibit "A" attached hereto and made a part hereof, and hereinafter referred to as "said real property." (2) a) Security shall convey said real property in accordance with the written instructions of the Owner, including all General Partners of any partnership owner. Owner may not assign, convey, or encumber its interest in said real property without the written consent of Security and a policy of title insurance for the full value of the property conveyed or the amount secured by said encumbrance issued by Security or a title insurance company approved by Security and paid for at the regular rates in effect for such title insurance. b) If the Owner constitutes two or more persons or legal entities and a disagreement or controversy arises between or among any of the Owners, including General Partners of any Partnership owner, regarding (1) said property, (2) this agreement, or (3) instructions to Security, then Security shall not be required to resolve said disagreement or controversy, take any action relating thereto, or accept any instructions from less than all Owners, *283 but may await the settlement thereof by Agreement of all Owners or by proper legal proceedings. At approximately the same time petitioners executed a document assigning to the Bodilys all their rights, title, and interest in the Holding Agreement. Security acknowledged receipt of this assignment, accepted this assignment and agreed to be bound thereby. On July 2, 1974, Safeco Title Insurance Company (Safeco) issued to Security an interim binder title insurance policy on the Royal property. On that same day Safeco issued an amending endorsement which named the Bodilys as additional insureds under the interim binder title policy. In a letter dated July 1, 1974, petitioners instructed Safeco as follows: in re: title Order 210543 Gentlemen: You are handed herewith the following: 1. Grant Deed from Wacker to Security Title Insurance Company describing property in your above title No. 2. Holding Agreement, Wacker and Security Title Insurance Company, describing property in your above title No. 3. Assignment of Wacker interest in above holding agreement to Dan Bodily and wife. You are hereby authorized to record and or deliver the above when you can deliver *284 to the undersigned the following: 1. $211,622.07 less the instruction to pay Raymond Steele the sum of $10,000.00 2. Consent from Security Title Insurance Company to allow Wacker to assign their interest in the above holding agreement and agreement from Bodily and wife to assume all the terms therein. As of June 1, 1974, the balances due to Fidelity, Imperial, and World on the unpaid mortgage balances were $2,037,038.80, $234,575.27, and $84,070.18, respectively, for an aggregate of $2,355,684.25. Following the July 1, 1974, agreement between petitioners and the Bodilys, the parties understood that the Bodilys, rather than petitioners, would be the primary obligors to Fidelity, Imperial, and World for direct payment of the monthly installments due on the outstanding mortgages. After July 1, 1974, the installment payments were made either by the Bodilys or their delegates, Mr. George Reade, the property manager of Royal, or S. G. Sanderson, resident manager of Royal. Subsequent to July 1, 1974, any late charges assessed as a result of delinquent loan payments were paid by the Bodilys. Until sometime in July 1974, Mr. Wacker maintained a business address at Royal. After *285 July 1, 1974, those loan payment notices and other loan-related mails which continued to be addressed to petitioners at the Royal business address were forwarded automatically by the post office to petitioners at their home. Upon receipt of the forwarded mails petitioners opened them and in most instances made photocopies of the contents. Thereafter, petitioners sent the loan-related mails to the Bodilys at Royal, and the Bodilys made the installment payments directly to the savings and loan associations. During June or July 1974, insurance was purchased on Royal in the name of Orville Wacker through Providence Washington Insurance Company (Providence). The policy premiums were paid by Mr. Bodily. As with the loan-related mails, on or about March 11, 1975, Providence mailed a notice of cancellation or termination to Mr. Wacker at the Royal address. Mr. Wacker opened, copied, and then forwarded the notice to the Bodilys. Likewise, on March 24, 1975, Providence mailed to Mr. Wacker at the Royal address a reinstatement endorsement which was forwarded.Mr. Wacker opened, photostated, and forwarded the reinstatement endorsement to the Bodilys. On December 17, 1974, the Bodilys *286 executed in favor of Fidelity the "right, power and authority during the continuance of the trust * * * to collect the rents, issues and profits of said property [Royal] * * *." This document was recorded on January 15, 1975. On June 3, 1975, Security quitclaimed to the Bodilys the property on which Security held the grant deed. The quitclaim deed was recorded in the official records of Sacramento County on June 3, 1975. On May 29, 1975, the Bodilys, as vendors, entered into a "Long Form Security (Installment) Land Contract With Power of Sale" with Vanguard Investments, as vendee, and Del Mar Commerce Company, as trustee. Thereunder, the Bodilys agreed to sell Royal, its furnishings and equipment, subject to certain terms and conditions. Under the sales agreement the Bodilys would retain legal title to the real property as security until the vendee's full payment of the purchase price. The document was recorded on June 3, 1975. In 1971 petitioners acquired Mountain Gate Ranch (Ranch) comprised of approximately 1,000 acres of forest. In part, for use as Christmas trees petitioners annually cut and sold some of the evergreens grown thereon. Prior to petitioners' purchase *287 of Ranch, the original and only survey to establish the property's boundaries had been made in 1881. Therefore during 1973 petitioners enlisted Mr. Emerson L. Smith, a licensed land surveyor, to survey the forest land.On February 13, 1974, Mr. Smith sent a second request for partial payment of $1,300 to Mr. Wacker with a note stating: "I spent alittle [sic] time out there last Monday and found another of your original corners which has not been found since 1881." The following year in an invoice dated January 17, 1975, Mr. Smith billed petitioners for-- Services rendered in survey of a portion of the Mountain Gate Placer Mine, in Sections 14, 15, 22, 23, T.15N., R. 11E. 1973
$2682.00
1974
4582.00
$7264.00
Pd. 3/4/74
$1300.00 [1]
Pd. 9/26/74
$1300.00
Balance due
$4664.00
I have submitted a copy of this map to the County Surveyor, he has 30 days to examine it before recording it. I can furnish you with as many copies as you want. On their joint 1974 income tax return, petitioners reported that they had received payments of $438,081.33 in their transaction with the Bodilys. Petitioners claimed that the sources *288 for the alleged $438,081.33 collection were as follows: Source
Amount
Principal payments on deeds of trust
from January 1, 1974, to June 1, 1974
$ 4,795.12
Difference between unpaid balance of
installment sale contract and unpaid
balances of existing deeds of trust
as of June 1, 1974
389,597.14
Principal payments made directly by
the Bodilys on existing deeds of
trust June 1, 1974, to December 31,
1974
43,689.07
Petitioners reported a gain of $154,658.88 on these payments. They calculated the gain by multiplying the alleged 1974 receipt by 35.30372 percent, i.e., the percentage of gain realized on the sale as figured under the terms of the 1969 Installment Contract. The amount of $33,635.92 of the gain was reported as ordinary income under section 1245 and the remainder was reported as long-term capital gain. Petitioners reported interest income for 1974 in the amount of $108,421.11, which represented interest paid directly by the Bodilys to the savings and loan associations on the Royal loans for the period of June 1, 1974, through December 31, 1974. Petitioners claimed an offsetting deduction for interest expense in 1974. Petitioners also claimed *289 in 1974 a business expense deduction for surveying property in the amount of $5,964. Petitioners claimed only a portion of the remaining loan costs with respect to the mortgages on the Royal property as a loan amortization deduction in 1974. In their 1975 joint income tax return petitioners reported interest income of $164,422.63, which amount was paid by the Bodilys on the deeds of trust.Petitioners deducted the identical amount as an interest expense in 1975. On the premise that petitioners collected $75,697.37 from the Bodilys on their installment note, capital gains were reported in 1975 in the amount of $26,723.99. Petitioners calculated the gain by multiplying the alleged 1975 collection by 35.30372 percent, i.e., the percentage of gain realized on the sale as figured under the terms of the 1969 Installment Contract. Petitioners claimed a deduction for loan amortization expense in 1975 of $4,468.08. Petitioners also claimed on their 1975 tax return a net operating loss deduction of $43,633.59. In his notice of deficiency to petitioners, respondent increased petitioners' reported 1974 capital gains and eliminated petitioners' reported 1975 capital gains with the explanation *290 that-- (a) Capital gains and losses are adjusted in each of the taxable years ended December 31, 1974, and December 31, 1975, to reflect changes in the amounts determined to be reportable by you as gain under an installment sale contract. It is determined that an agreement dated July 1, 1974, entered into pursuant to the terms of the installment sale contract dated May 27, 1969, results in the termination of and disposition of the installment obligation. Since there is a determination that there was a disposition of the installment sale contract in July 1974, within the meaning of section 453(d) of the Internal Revenue Code, the balance of the gain must be fully recognized in 1974. * * * Respondent disallowed petitioners' claimed interest expense deductions for 1974 and 1975 and determined that petitioners had no interest income in either of these years from the Royal transaction with the explanation that-- Since it is determined that the installment contract was disposed of in 1974, it is held that you do not have interest income reportable from this source nor do you have an interest deduction based on thse amounts. * * * With respect to the amortization *291 of the loan expenses, respondent explained his adjustments as follows: (d) In view of the determination that the installment sale contract was disposed of in 1974, as discussed in item (a), above, the unamortized balance of the loan expense related to the property is deductible in full in 1974. This results in an increase in the amortization deduction for 1974 of $72,683.27, and disallowance of the amortization deduction claimed in 1975 in the amount of $4,468.08. In explanation of the adjustment with respect to the $5,964 claimed by petitioners in 1974 as a survey expense, respondent stated that the claimed deduction-- is disallowed since it is held that the expenditure represents a capital expense which is an addition to the cost of the land surveyed. This expenditure is for a non-recurring item and results in a benefit to the property which has a useful life extending beyond the year in which the survey was made.
Respondent explained his disallowance of the net operating loss deduction for 1975 claimed by petitioners by stating that-- (g) The net operating loss deduction claimed on your return for the year ended December 31, 1975, in the amount of $43,633.59 is disallowed. *292 Adjustments to income for the preceding taxable year ended December 31, 1974, have eliminated any net operating loss for 1974 and have increased income to the extent that the net operating loss carryover to 1974 from earlier years in the amount of $14,130.00 is fully absorbed in 1974. Accordingly, there is no available loss to be carried forward to 1975. In general section 453 is a relief measure which enables a taxpayer who sells property under a qualified installment sales contract to defer reporting portions of realized gain until his future receipt of the installments in cash or its equivalent. Congress has clearly stated that the purpose of enacting this special treatment for certain installment sales is to allow a taxpayer to avoid income bunching upon receipt of the purchaser's installment obligation in the year of sale and instead to "clearly reflect income" during the years following the sale. S. Rept. No. 52, 69th Cong., 1st Sess. (1926), 1939-1 C.B. (Part 2) 332, 346; H. Rept. No. 356, 69th Cong., 1st Sess. (1926), 1939-1 C.B. (Part 2) 361, 363; H. Rept. No. 91-413 (1969), 1969-3 C.B. (Part 1) 200, 267. Section 453(a) provides *293 that dealers regularly selling personal property on an installment basis may return as income from the sale or other disposition of that property in any year the proportion of the payments actually received in the particular year that the gross profit realized bears to the total contract price. This treatment is extended to real property sales in section 453(b) if, in the year of sale, payments do not exceed 30 percent of the selling price. In pertinent part, sections 453(a) and (b) provide: SEC. 453. INSTALLMENT METHOD. (a) Dealers in Personal Property.-- (1) In general.--Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price. (2) Total contract price.--For purposes of paragraph (1), the total contract price of all sales of personal property on the installment plan includes the amount of carrying charges or interest which is determined *294 with respect to such sales and is added on the books of account of the seller to the established cash selling price of such property. This paragraph shall not apply with respect to sales of personal property under a revolving credit type plan or with respect to sales or other dispositions of property the income from which is, under subsection (b), returned on the basis and in the manner prescribed in paragraph (1).
(b) Sales of Realty and Casual Sales of Personalty.-- (1) General rule.--Income from-- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the tax-payer if on hand at the close of the taxable year) for a price exceeding $1,000, may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation.--Paragraph (1) shall apply-- (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the *295 taxable year of the sale or other disposition-- (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 per cent of the selling price. (B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the income was (by reason of section 44(b) of the Internal Revenue Code of 1939) returnable on the basis and in the manner prescribed in section 44(a) of such code.
Section 453(d)(1), which was originally enacted in substantially its present words by section 44(d) of the Revenue Act of 1928, 45 Stat. 806, provides: (d) Gain or Loss on Disposition of Installment Obligations.-- (1) General rule.--If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and-- (A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or (B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, *296 or disposition otherwise than by sale or exchange. Section 1.453-9, Income Tax Regs., issued with respect to section 453(d), provides in pertinent part: (a) In general. Subject to the exceptions contained in section 453(d)(4) and paragraph (c) of this section, the entire amount of gain or loss resulting from any disposition or satisfaction of installment obligations, computed in accordance with section 453(d), is recognized in the taxable year of such disposition or satisfaction and shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received by the taxpayer. Resolution of the first issue depends upon whether the Bodilys' installment obligation, the May 29, 1969, Installment Contract, was satisfied or disposed of within the meaning of section 453(d) in 1974. Initially the parties were in disagreement as to whether there had been a "disposition" of petitioners' installment obligation in either 1974 or 1975. Petitioners reported their income on their Federal tax return for each of the years 1974 and 1975 as if no disposition of the installment obligation had been made *297 in either year. However, on brief petitioners specifically conceded that there had been a disposition of their installment obligation but contended that the disposition was in 1975. In their reply brief petitioners stated: Petitioners conceded in their opening brief that the Court may rule, under the facts of this case that there is a disposition of an installment obligation pursuant to Internal Revenue Code Section 453.Petitioners assert that said disposition took place in 1975 rather than in 1974, as asserted by Respondent. Petitioners state that the "disposition" did not occur until 1975 because the Bodilys did not assume the mortgage on Royal until that year. Respondent argues that the Bodilys assumed the mortgages on Royal in 1974 and that the "disposition" of the installment obligation therefore occurred in 1974. [5]
*298 The record shows that in 1974 the final cash balance, computed to be the amount of $211,622.07, due to petitioners under the 1969 Installment Contract was paid by the Bodilys to the escrow account and delivered by the escrow agent to petitioners during July 1974. Under the provisions of section 453(a) and (b), petitioners are required to return as income the proper proportion "of the installment payments actually received in that year." [6] On brief both respondent and petitioners argue that a "disposition" of the installment obligation necessitates determining whether the Bodilys assumed the outstanding balances on the Fidelity, Imperial, and World mortgages. In our opinion section 453(a) and (b) require this determination. The difference between the indebtedness on the property assumed by the purchaser and the seller's basis in the property is a payment "actually received" in the year the mortgages are assumed. Therefore, if in 1974 petitioners received both the final cash amount due on the installment obligation and the balance due on the purchase price by way of the purchasers' assumption of the mortgages, petitioners actually received all amounts due on the remainder of *299 the installment obligation as payments in 1974. Section 1.453-4(c), Income Tax Regs., provides that in determining the selling price of mortgaged property, that portion of a mortgage assumed by the purchaser is included in the property's selling price. For purposes of determining the payments and total contract price, the amount of the mortgage is included to the extent that it exceeds the basis of the property. The purpose of this regulation is to make possible the taxation of the entire profit while the purchase moneys are received where the sale is reported on an installment basis and *300 the buyer either assumed a mortgage or took subject to it. Estate of E. P. Lamberth v. Commissioner,31 T.C. 302, 315 (1958). In full, section 1.453-4(c), Income Tax Regs., provides: (c) Determination of "selling price". In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and secs. 1.453-1 through 1.453-7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. The term "payments" does not include amounts received by the vendor in the year of sale from the disposition to a third person of notes given by the vendee as part of the purchase price which are due and payable in subsequent years. Commissions and other selling expenses paid or incurred by the vendor shall not reduce the amount of the payments, the total contract *301 price, or the selling price. The Supreme Court in Burnet v. S. & L. Building Corporation,288 U.S. 406 (1933), upheld the validity of a prior regulation which substantively was the same as this regulation, and this Court has recognized the authority of section 1.453-4(c) in numerous cases. E.g., Goodman v. Commissioner, 74 T.C.     (July 16, 1980); Waldrep v. Commissioner,52 T.C. 640 (1969). Section 1.453-1(b), Income Tax Regs., provides that "gross profit means the selling price less the adjusted basis * * *." In essence, the total contract price is that amount which the seller receives directly from the buyer. Therefore, where, in addition to the stated sales price, a buyer assumes a seller's obligation, the gain that the seller realizes is increased by the excess of the mortgage over the seller's basis in the property sold.
Whether a taxpayer assumes a mortgage is determined by the facts and circumstances of the transaction as a whole. Voight v. Commissioner,68 T.C. 99, 112 (1977), affd. 614 F.2d 94 (5th Cir. 1980). Respondent points out that in both the 1969 Installment Contract *302 and the July 1, 1974, agreement, petitioners and the Bodilys used terminology indicating that the latter party would assume the Fidelity, Imperial, and World mortgages. In the July 1, 1974, agreement, the parties agreed as follows: 1. WACKER does hereby concurrently execute and deliver to BODILY his good and sufficient Grant Deed conveying to BODILY, subject to the existing first trust deeds, which BODILY agrees to assume pursuant to the terms of the Installment Contract of Sale dated May 27, 1969. [Emphasis added.] The 1969 Installment Contract provides in paragraph 2(E) that-- E. Except in the event of the exercise by Vendee of the option given to them under subparagraph "F", below, the balance of the purchase price, and all accrued interest thereon shall be paid on the sixth (6th) anniversary of the date upon which this or any other document giving notice of Vendee's interest in the subject property was recorded, by Vendee's assuming the unpaid balances of the loans secured by the existing deeds of trust, delinquent taxes, and other encumbrances upon the subject property, as said loans and deeds of trust are described in Paragraph "4", below, by applying the amount *303 of said assumed indebtedness toward the balance of the purchase price, and by paying the balance of the purchase price and accrued interest thereon, in cash to Vendor. [Emphasis added.] However, the labels used by parties to a contract are not determinative and are only one possible indication of whether the mortgages were assumed. For purposes of section 453 the courts have explained the parameters of what constitutes an assumption of a mortgage in connection with the issue of whether a tax-payer has received as an initial payment an amount in excess of the acceptable limit for election of installment basis treatment. However, the discussion found in those cases is equally applicable to the instant case. In those cases, we have held that "the expressions used in the regulation [section 1.453-4(c)], 'property is merely taken subject to the mortgage' and 'mortgage is assumed by the purchaser,' have the meanings customarily attributed to them in transactions involving transfer of mortgaged property." Voight v. Commissioner,68 T.C. 99, 110 (1977), affd. 614 F.2d 94 (5th Cir. 1980). The understanding of those customary meanings was expressed in *304 Stonecrest Corporation v. Commissioner,24 T.C. 659, 666 (1955): Taking property sjbject to a mortgage means that the buyer pays the seller for the latter's redemption interest, i.e., the difference between the amount of the mortgage debt and the total amount for which the property is being sold, but the buyer does not assume a personal obligation to pay the mortgage debt. The buyer agrees that as between him and the seller, the latter has no obligation to satisfy the mortgage debt, and that the debt is to be satisfied out of the property. Although he is not obliged to, the buyer will ordinarily make the payments on the mortgage debt in order to protect his interest in the property. Where a buyer assumes a mortgage on property, he pays the seller for the latter's redemption interest, and in addition promises the seller to pay off the mortgage debt. This promise of the buyer can ordinarily be enforced by the mortgagee. 5 Tiffany, The Law of Real Property, secs. 1435, 1436 (3d ed. 1939); IV American Law of Property, secs. 16.125, 16.127, 16.128-16.132 (1952). Both respondent and petitioners rely upon the language of Stonecrest Corporation, *305 supra, and Voight,supra, in support of their respective positions. Specifically, petitioners point to the following language: The regulation has no application until there is an actual assumption. The fact that the seller was to use the installment payments to pay off the mortgage debt does not constitute an assumption of the mortgage by the buyer. As we have pointed out, assumption of a mortgage means that the buyer takes over the seller's obligation to the mortgagee and incurs an obligation generally enforceable by the mortgagee. Here, as the parties have stipulated, the buyer was under no present obligation to the mortgagee. Nor was any sale made by petitioner "subject to" a mortgage in the ordinary usage of that expression. The expression means that the buyer has no personal obligation to pay the mortgage debt; that, as between seller and buyer, the seller has no obligation to pay the debt; and that the debt is to be satisfied from the property. Here there was no understanding that the debt was to be satisfied out of the property; instead it was explicitly provided in the agreement of the parties that the seller was to make the payments on the mortgage debt *306 until there was a conveyance of the property. * * * [Stonecrest Corporation v. Commissioner,supra at 667.] Petitioners also rely upon the Voight discussion, which states: There is no question that Madison was obligated to petitioners to make payments equal to the mortgage payments. It is also clear that Madison was directly liable to the mortgagee if the mortgage payments were not made. These obligations, coupled with the factor of direct payment to the mortgagee, supply the element of assumption that petitioners deny exists. We find that, not only was Madison permitted to make direct payment to the mortgagee, it was intended by all parties that it would do so. * * * [Voight v. Commissioner,supra at 113.] Petitioners explicitly argue that the principal mortgagee, Fidelity, could not enforce the mortgage against the Bodilys until January 15, 1975, the recordation date of the document in which the Bodilys executed in favor of Fidelity the "right, power and authority during the continuance of the trust * * * to collect the rents, issues and profits of said property [Royal] * * *." Additionally, petitioners contend that *307 the conduct of the parties indicates that the Bodilys were primarily obligated to petitioners to make the monthly payments due on the mortgages until the Bodilys would actually assume the mortgage payments in 1975. We do not agree with petitioners' interpretation of the facts. In the instant case, aside from the language of the 1969 Installment Contract and the July 1, 1974, agreement, the following factors have led us to the conclusion that the Bodilys assumed the unpaid balances of the mortgages in 1974: (1) According to the parties' stipulations, both petitioners and the Bodilys understood that the Bodilys, rather than petitioners, would be primarily responsible for directly paying all monthly installments to Fidelity, Imperial, and World as of July 1974. (2) After July 18 1974, all installment payments were made by either the Bodilys or their delegates. (3) On July 1, 1974, petitioners assigned to the Bodilys all of their rights and privileges under the Loan Consolidation and Standby Agreement. (4) The escrow instructions dated July 1, 1974, from petitioners to Safeco instructed Safeco to deliver to Security the grant deed on the Royal property along with a Holding *308 Agreement. Those instructions also referred to a document addressed to Security thereunder assigning to the Bodilys all of petitioners' rights, title and interest in the Holding Agreement. The instructions further directed Safeco to transmit all of the above documents to the proper parties upon the Bodilys' payment of the $211,622.07 cash balance due to petitioners. By assigning to the Bodilys petitioners' rights in the Holding Agreement, the Bodilys were put into the position of standing in the shoes of the "Owner." As a result, without the consent of any other party, the Bodilys could instruct Security to convey Royal to any party, including themselves. These provisions indicate that in July 1974 petitioners considered that they had been fully paid for the Royal property. Certainly full payment included the $2,355,684.25 assumption of mortgages. (5) All mails from the mortgagees with regard to mortgage payments which were addressed to petitioners were promptly forwarded by petitioners to the Bodilys for their payment. The record does not disclose why the notices with respect to the mortgages were mailed to petitioners. Insofar as this record shows, the mortgagees' mailing *309 lists may have been separate and apart from their list of actual obligors and the mortgagees had failed to mail the notices to the Bodilys as a result of their failure to promptly substitute on their mailing list the Bodilys' name for that of petitioners. Certainly the improper mailing does not mean necessarily that the mortgagees would not look to the Bodilys in 1974 in event of default. Accordingly, we conclude that petitioners were financially benefited by the Bodilys' 1974 assumption of the Fidelity, Imperial and World mortgages, and petitioners must include in their 1974 reportable income the excess of the mortgages assumed over their basis in the property.As a result of this determination, petitioners are not entitled to their claimed interest deductions in 1974 and 1975 and are not required to include in their interest income an amount representing the interest paid by the Bodilys to the mortgagees. As a result of this conclusion, it follows that petitioners are not entitled to their claimed 1975 net operating loss deduction and are entitled to a greater deduction than they claimed in 1974 for the unamortized balance of the loan expense relating to the sale of Royal. They *310 are not entitled to any deduction for the unamortized balance of loan expense in 1975 since the entire balance is deductible in 1974. The final issue for decision is whether petitioners are entitled to deduct the $5,964 survey cost in 1974 as an ordinary and necessary business expense under section 162 or whether that amount constitutes a capital expenditure which is nondeductible under the provisions of section 263(a). As we stated in Louisiana Land and Exploration Co. v. Commissioner,7 T.C. 507, 515 (1946), affd. 161 F.2d 842 (5th Cir. 1947) -- The distinction between capital expenditures and business expenses is generally made by looking to the extent and permanency of the benefit derived from the outlay.The benefit from business expenses is generally realized and exhausted within a year and the expense is therefore said to be of a recurring nature. * * * On the other hand, an item of expense is of a capital nature where it results in the taxpayer's acquisition or retention of a capital asset, or in the improvement or development of a capital asset in such a way that the benefit of the expenditure is enjoyed over a comparatively lengthy period *311 of business operation. * * * A capital expenditure is thus nonrecurring, even though many similar expenditures are made by the taxpayer. * * * Petitioners contend that the survey expenditure is deductible because "it was necessary to remark [sic] obliterated boundaries and prevent loss of land through adverse possession or fines from cutting timber on U.S. forestry land." Petitioners rely on our decision in Brier Hill Collieries v. Commissioner,12 B.T.A. 500 (1928), affd. in part 50 F.2d 777 (6th Cir. 1931). [7] There, the taxpayer owned wooded mountainous land. The property had been surveyed and the boundaries marked sometime prior to 1918, but the markings had been obliterated.In 1918 and 1919 the taxpayer hired a surveyor to resurvey the land and demark the boundaries in an effort to prevent the loss of land by adverse possession. We held that the expenditures were ordinary and necessary expenses incurred for the taxpayer's protection of its property against adverse possession. Here respondent *312 submits that petitioner is not entitled to an ordinary and necessary business expense deduction because petitioners have failed to produce evidence that "would indicate that his lands were either threatened by adverse possession or that he was under threat of fine from cutting timber on government land." The record indicates that the land was used for cutting timber, including Christmas trees. While petitioners assert the possibility of a loss of land through adverse possession or fines, they have failed to prove that the survey expenses were incurred for any reason other than to establish definite boundaries for whatever benefit might result therefrom during subsequent years. The cost of defending or perfecting a property's title is a capital expenditure and is not deductible under section 162 or section 212. See section 1.263(a)-2(c), Income Tax Regs. The evidence in the record fails to establish that the survey expenditures were recurring in nature and resulted in a benefit generally realized and exhausted within one year. In our view, the survey costs were incurred to perfect the property's title and therefore constitute a capital expenditure within *313 the meaning of section 263. Because of the agreement of the parties with respect to a loss carryback deduction in 1974, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue. Petitioners on brief conceded that they disposed of their installment obligations but contend that the disposition occurred in 1975 rather than 1974.↩
2. The parties stipulated that if the primary issues are decided for respondent, petitioners are entitled to a 1975 net operating loss carryback which is allowable as a net operating loss deduction in 1974.↩
3. On their 1969 income tax return petitioners reported the gain from the sale of Royal on an installment sales basis. Petitioners calculated their 1969 gain as follows: Gross Sales Price
$2,796,500.00
Less Sales Commissions
35,000.00
Net Sales Price
$2,761,500.00
Cost
2,438,378.76
Less Depreciation
664,147.28
Net Cost
1,774,231.48
Gain on Sale
$ 987,268.52
Percentage of Gain $987,268.52/$2,796,500.00 = 35.30372% Taxable in 1969:
1969 collection $15,563.21 X 35.30372% = $5,494.39↩
4. The monetary settlement, as refined, is as follows: Orville C. and Pearl Wacker Settlement of Installment Contracts Due from Dan and Anita Bodily As of June 1, 1974 Balance of Installment Sales Contract Due
Orville C. & Pearl Wacker from Dan &
Anita Bodily
2,745,281.39
Illegible
*↩
Mortgage Obligations
Net Amount
Fidelity S & L Assn. *
$2,037,038.80
Imperial *
234,575.27
World *
84,070.18
2,355,684.25
2,355,684.25
Net Contract Balance
389,597.14
Cash Items Due Orville C. & Pearl
Wacker
Property Tax Proration
1/12 of $90,033. *
7,502.77
Principal Payment on Mortgages -
June 1, 1974
6,179.26
Impounded Balances - June 1, 1974
Fidelity S & L Assn.
14,682.00
Imperial
1,005.96
15,687.96
Prepaid interest -
Imperial S & L Assn.
1,485. *
Payroll - June 1, 1974
to June 15, 1975
2,200.00
Accounts Receivable - Tenants -
May 31, 1974
1,004. *
Sacramento County - Proration
Sewer Bill
265.50
Insurance Proration Apt. House *
217.5 *
Payroll - June 16, 1974
to June 30, 1974
254. *
Vendors Concession - Service
Distribution Proration
234.15
Returned Check - Blair
98.00
Telephone Expense - Bodily
35.29
Total - Orville C. & Pearl Wacker
35,164.90
Cash Items Due Dan & Anita Bodily
Rents Collected - June
and July 1974
49,697.19
Deposits
12,576.00
Leasehold Rent - May 1974 18,592.00
Contract Payment - May 1974 17,241.67
1,350.33
Advances to Settle Obligations
to Leave Property in
Original Condition *
124,516.45
Assumption of Partial
Commission Due Carriage
Realty
25,000.00
Total Due Dan & Anita Bodily
213,139.97
Net Due Dan & Anita Bodily
177,975.07
Balance of Installment Contract Due
Orville C. & Pearl Wacker
211,622.07
1. accrued and deducted in 1973↩
5. Under the facts here present we doubt that a "disposition" of the installment obligation as the term is used in section 453(d)(1)(B) occurred in either 1974 or 1975 as distinguished from a payment in full or termination of the installment obligation. Generally a "disposition" of an installment obligation is a transfer in some manner of the ownership of the installment obligation itself to a third party. See Town and Country Food Co. v. Commissioner,51 T.C. 1049, 1057 (1969); Miller v. Usry,160 F. Supp. 368, 371 (W.D. La. 1958); Cunningham v. Commissioner,44 T.C. 103, 108 (1965); Wynne v. Commissioner,47 B.T.A. 731↩ (1942). However, the issue of "disposition" has become immaterial to the decision of this case since both parties now recognize that respondent's adjustments to petitioners' income are correct if the Bodilys assumed the mortgages on Royal in 1974 and that it will be necessary to recompute petitioners' income with respect to the Royal transaction if the Bodilys did not assume the mortgages until 1975. Respondent filed an amendment to answer claiming, in the alternative, an increased deficiency for the year 1975 in the event we should decide that the Bodilys neither assumed the Royal mortgages or took the Royal property subject to those mortgages until 1975.
6. In Wynne v. Commissioner,47 B.T.A. 731, 735 (1942), the Board rejected respondent's argument that the transaction therein triggered the predecessor of section 453(d). However, the Board stated: It does not follow, however, that respondent has no remaining refuge. Subdivisions (a) and (b) require that taxpayers return as income the proper proportion "of the installment payments actually received in that year." If, therefore, this obligation was discharged in full by a payment "actually received," the deficiency would be supportable. * * *↩
7. Petitioners also cite Churchill Farms, Inc. v. Commissioner, T.C.M. 1969-192, which briefly discusses Brier Hill Collieries,supra↩.